[Civ. No. 16015. First Dist., Div. Two. Dec. 6, 1954.]

HAWAIIAN PINEAPPLE COMPANY, LIMITED (a Corporation), etc., Respondent, v. ECKERT ENGINEERING CORPORATION (a Corporation), Appellant.

Richard tum Suden for Appellant.

Brobeck, Phleger & Harrison for Respondent.

DOOLING, J.—Plaintiff-respondent Hawaiian Pineapple Company, which was engaged in canning peaches in 1951 in its San Jose plant, contracted with defendant-appellant Eckert Engineering Corporation to store certain ripe peaches under refrigeration in appellant's cold storage plant at Manteca. Beginning August 29, 1951, and over several days thereafter 27,299 boxes of peaches were delivered to appellant by respondent for storage. A large portion of these peaches spoiled and respondent brought this action for damages alleging that by reason of appellant's negligence the peaches were not properly refrigerated and the spoiling of the peaches resulted. Appellant cross-complained for the storage of the peaches at the contract rate. The court, sitting without a jury, found in favor of respondent and gave judgment for the damages found less the amount due appellant for the storage of the peaches.

Appellant argues on appeal: 1. that the evidence shows that respondent was repeatedly warned that the peaches were spoiling and did nothing to mitigate the damages; 2. that the method of computing the damages is erroneous and the amount awarded excessive.

While the evidence is in sharp dispute in many respects appellant claims that it shows without substantial conflict that on August 29 when the first peaches were delivered to its plant many of the peaches were soft and not ''in too good shape to hold any length or period in a storage plant'' and that Mr. Keeney, respondent's field agent, was immediately advised of this fact by telephone and Keeney asked them to store the peaches anyway; that thereafter Mr. Rose, respondent's plant manager in San Jose, was advised by telephone on September 1 and September 7 that the peaches were spoiling and did nothing until September 11, after a third telephone call to him on September 10, when respondent began to remove the peaches.

However, as above pointed out, there is much conflict in the evidence and accepting the evidence, and the reasonable inferences therefrom, most favorable to the judgment, as we must on appeal, we are satisfied that the evidence supports the judgment. The peaches had all been inspected and passed by agricultural inspectors shortly before they were delivered to appellant's storage plant. Mr. Keeney's version of the August 29 telephone call to him, which we must accept in support of the judgment, was that he was told by Mr. Burdick, representing appellant, that "he thought the peaches were overripe" and "I assured him that they had just passed a suitable test for canning or freezing." Mr. Burdick saw some of the peaches, though not all because some came from a different loading point, before they went to appellant and those that he saw were fit for storage. There is also circumstantial evidence which would support the conclusion that the peaches delivered on August 29 were fit for storage. The storage room was 100 feet long and the refrigeration came from a blower at one end. There is evidence that the blower was not adequate to circulate the cold air properly to the other end of this room, and evidence that when the peaches were removed those near the blower were in good condition while those farther away from it were not. The entrance to the storage room was at the opposite end from the blower and, while no evidence is pointed out as to where the first peaches received were stored, it is a reasonable inference that the storage began near the blower and at the other end of the building from the entrance. That would certainly be normal procedure in any storage operation. There is further evidence that other peaches placed in cold storage at the same time by respondent in other cold storage plants did not spoil, and this included split loads where some of the peaches from the same grower received at the same time were delivered to appellant and the balance sent to another storage plant.

The evidence is ample to support the conclusion that the peaches when delivered were fit for storage, that the refrigeration system was inadequate and the spoiling of the peaches resulted from that fact.

As to the subsequent telephone calls Rose testified positively that he received no telephone call before September 10 and that immediately thereafter on September 11 he began to remove the peaches from appellant's plant. Appellant points to the fact that several witnesses testified to the calls of September 1 and 7 and that the Manteca telephone com-

pany's calculograph slips show that calls were completed to Rose on those days. The slips only record calls and not the conversations. Moreover appellant's own witnesses were not consistent in their accounts of these calls and their substance. Mr. Eckert, the president of appellant, died before the trial but his deposition had been taken and was read at the trial. The evidence of appellant's other witnesses was that Mr. Eckert made the calls on September 7 and 10. Mr. Eckert however only testified to one call to Rose. His testimony was: "I got a little worried one night at home in bed, and the next morning . . . I got ahold of my manager, Conover, and I believe it was a Saturday morning . . . So Conover and I went around the top of the load and could see evidence of overripeness all through the top of the load, and I . . . called Mr. Rose, got him on the phone, and told him about the condition. And I said, 'I am not satisfied with the last check that was taken . . . Why don't you come down and let Mr. Conover and myself go over the load with you . . . and if there's any reason for alarm, let's do something about it.'

"He said, 'Well, I would come right now, Mr. Eckert, but I have to take a by-pass through Sacramento . . . but I will be right in as soon as I do that.'

"I think he got in about Monday and . . . the next day they started to pull out the fruit. . . ."

This testimony is significant in at least two respects. 1. It corroborates Rose's testimony that he received only one call from Eckert regarding the condition of the peaches. 2. It supports the conclusion that Rose acted with reasonable promptness after receiving Eckert's call. The rule that a party must use reasonable care and diligence to mitigate damages is not disputed (*Valencia* v. *Shell Oil Co.*, 23 Cal.2d 840 [147 P.2d 558]) but whether respondent exercised such care and diligence in this case was a question of fact for the trial court under the evidence.

 Appellant complains that the court made no findings on the question of failure to mitigate damages. It was not put in issue by the pleadings, the answer consisting only of denials, and the finding of the court that the damage was caused by appellant's negligence was responsive to the pleadings and amounts to a finding that it was not caused by respondent's negligence. (*Valencia* v. *Shell Oil Co.*, *supra*, 23 Cal.2d 840, 846-847.)

 Respondent made proof of its damage in two ways. It introduced evidence of the loss of fruit in canning the week

before and the week after these peaches were canned, and the greater loss the week in which the fruit in issue was canned. It also introduced evidence of the number of boxes of spoiled fruit in this lot and the average weight of boxes of similar unspoiled fruit. The result of the first type of evidence showed slightly less damages than the second and the court accepted the lesser amount. Since the peaches lost weight by spoilage completely accurate evidence of the weight of the fruit lost could not be produced. Under the circumstances the methods of proof used were reasonable and appellant cannot complain because more exact proof was impossible. (*Zinn* v. *Ex-Cell-O Corp.*, 24 Cal.2d 290, 297-298 [149 P.2d 177].)

Judgment affirmed.

Nourse, P. J., and Kaufman, J., concurred.

A petition for a rehearing was denied January 5, 1955.